JOHN M. BERTSCH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentBertsch v. CommissionerDocket No. 9813-80.United States Tax CourtT.C. Memo 1983-646; 1983 Tax Ct. Memo LEXIS 140; 47 T.C.M. (CCH) 147; T.C.M. (RIA) 83646; October 20, 1983. John M. Bertsch, pro se. Harvey S. Sander and Gregg M. Weiss, for the respondent. FEATHERSTONMEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $17,033 in petitioner's Federal income tax for 1972 together with additions to tax for fraud under section 6653(b) 1 in the amount of $8,517 and for failure to pay estimated tax under section 6654(a) in the amount of $545.06. The issues for decision are as follows: 1. Whether petitioner received and failed to report as*141 income the amount of $15,829.54, representing one-third of the $47,488.62 in proceeds from tax refunds secured through the filing by another individual of false and fictitious Federal and New York State income tax returns; 22. Whether, if petitioner underpaid his income tax for 1972, any part of the underpayment of tax was due to fraud within the meaning of section 6653(b); 3. Whether, in the alternative, if we find that he underpaid his income tax but is not liable for the section 6653(b) additions to tax for fraud, any part of petitioner's underpayment of income tax was due to negligence within the meaning of section 6653(a)(1); whether petitioner's failure to file a return for 1972 was due to reasonable cause within the meaning of section 6651(a)(1); and 4. Whether petitioner is liable for the addition to tax under section 6654(a) for the underpayment of estimated tax. *142 FINDINGS OF FACT At the time of the filing of his petition in this case, petitioner resided in Port Jefferson Station, New York. During 1972, the taxable year at issue, petitioner lived at home with his parents and was enrolled at a local college where he was studying business administration and real estate. He received educational benefits from the Veterans' Administration of approximately $200 per month and unemployment compensation of $58 per week. Petitioner did not file a Federal income tax return for 1972; however, petitioner was aware at that time of the general requirement that individuals must file Federal and New York State income tax returns if they have sufficient income. For the years 1970 and 1971, petitioner did file Federal income tax returns. 1.Petitioner's Early Relationship with Kevin ManganIn 1968 petitioner met Kevin Mangan (hereinafter Kevin) while they were working together at a Howard Johnson's restaurant. They developed a social relationship and discussed the possibility of going into business together. No business relationship materialized between petitioner and Kevin at that time, however, and petitioner left his employment at Howard*143 Johnson's to serve in the U.S. Army from May 1968 through May 1971. Kevin left his employment at Howard Johnson's in the fall of 1968. He became involved as the owner and operator of various business ventures including a snack bar, a bar and restaurant concession, and a catering business. When petitioner returned home on leave from his miltary service and after his discharge in 1971, he worked "off the books" for Kevin as a bartender and in other capacities related to Kevin's businesses. 2. The Tax Refund SchemeIn the Fall of 1971, Kevin's brother, Frank Mangan (hereinafter Frank), who was employed as a revenue agent with the Internal Revenue Service at the time, devised a fraudulent income tax refund scheme and presented it to Kevin as a way to generate income for Kevin. Frank wanted to generate income for Kevin so that Kevin could repay Frank approximately $10,000 which he had loaned to Kevin several years prior to 1971. He also wanted to generate additional income so that Kevin could use the money to undertake another business venture--a real estate business in which Kevin planned to buy houses and offer them for rent. In early to mid-January 1972, Frank prepared*144 fictitious 1971 Federal and New York State income tax returns and fictitious Forms W-2 which were submitted along with the returns. Each of the fictitious returns indicated that refunds were payable. Frank gave the completed returns to Kevin who signed and filed them with the Internal Revenue Service and New York State taxing authority over the course of the next week or two after he received them from Frank. After he prepared the fictitious income tax returns and gave them to Kevin, Frank had no further involvement in the scheme.Before Kevin filed the returns, he made several trips by car from his home in Farmingdale, Long Island, into New York City in order to locate rooming houses or hotels which could serve as appropriate mailing addresses for the refund checks which would be sent pursuant to the fictitious returns. Kevin gave Frank the addresses which he selected as mailing drops and Frank inserted the addresses on the fictitious returns before he gave them to Kevin for filing. In January 1972, Kevin signed and filed fictitious Federal and New York State income tax returns for 1971 in the names of the following individuals: Social SecurityNameNumberJohn McCarthy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John McCarthy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John McCarthy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John McCarthy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John McCarthy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John McCarthy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Scott Murphy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*145 In February 1972, Kevin rented rooms in five rooming houses or hotels at various locations in New York City to serve as mailing drops for the false refund checks. Federal refund checks were issued in 1972 to the individuals at the addresses and in the amounts as follows: Social SecurityNameNumberAddressAmountScott Murphy169-42-83992166 Broadway$9,421.77John McCarthy092-12-0561230 W. 76th St.$9,033.71John McCarthy052-03-7261230 W. 76th St.$9,201.12John McCarthy134-14-8963303 W. 80th St.$9,421.06John McCarthy099-05-7576306 W. 94th St.$8,875.63John McCarthy130-26-1053306 W. 94th St.$8,991.02New York State refund checks were issued in 1972 to the individuals at the addresses and in the amounts as follows: Social SecurityNameNumberAddressAmountScott Murphy169-42-83992166 Broadway$1,974.18John McCarthy092-12-0561230 W. 76th St.$2,251.86John McCarthy052-03-7261230 W. 76th St.$1,989.88John McCarthy134-14-8963303 W. 80th St.$2,149.70John McCarthy099-05-7576306 W. 94th St.$1,876.13John McCarthy130-26-1053306 W. 94th St.$1,419.94John McCarthy902-08-9214425 West End Ave.$1,921.27*146 During January through March 1972, Kevin opened accounts at several banks located in the Bronx, Manhattan, and Westchester County in the names and on the dates as follows: NameBankDateJack M. McCarthyFranklin National BankJanuary 20, 1972Scott M. MurphyNational Bank of WestchesterJanuary 20, 1972(White Plains)John McCarthyChase Manhattan BankJanuary 27, 1972(Fordham Road)John McCarthyNational Bank of WestchesterMarch 2, 1972(New Rochelle)McCarthy Enterprises,Chase Manhattan BankMarch 7, 1972Inc.(E. 42nd Street)Approximately one month after he filed the returns, Kevin made periodic weekly or bi-weekly trips from his home in Farmingdale, Long Island to the rooming houses or hotels in New York City for the purpose of obtaining the refund checks issued on the basis of the fictitious returns. Kevin picked up in total five Federal refund checks and one State refund check from the rooming houses or hotels to which they were mailed. Kevin took the refund checks to the bank for deposit or negotiation on the same day he picked them up from the rooming houses or hotels. He deposited the six refund checks, five Federal*147 and one New York State, into the bank accounts listed above which he had earlier opened as follows: DepositAmountDateBank AccountAccount Name$ 9,421.063/1/72National Bank ofWestchester(White Plains)Scott Murphy 1$ 9,421.773/8/72National Bank ofWestchester(White Plains)Scott Murphy$ 9,201.123/8/72National Bank ofWestchester(New Rochelle)John McCarthy$ 8,991.023/14/72Chase Manhattan Bank(Fordham Road)John McCarthy$ 9,033.713/15/72Chase Manhattan Bank(E. 42nd Street)McCarthy Enterprises$ 1,419.943/14/72Franklin National BankJohn McCarthy$47,488.62*148 Except for the nominal initial deposits made to open the foregoing accounts, Kevin deposited no funds from any source other than the refund checks into these accounts. During March and April 1972, Kevin withdrew varying amounts in cash from the accounts totalling virtually the entire amount of the proceeds of the refund checks. Kevin had originally intended to use the proceeds of the refund scheme to repay the $10,000 debt which he owed to Frank and then to divide the excess proceeds equally between himself and Frank. Kevin, however, paid none of the proceeds to Frank either in repayment of the $10,000 loan or for Frank's role as originator of the scheme. Kevin maintained no books or records on his disbursement of the proceeds from the scheme. As a result of their perpetration of this fraudulent tax refund scheme, both Kevin and Frank were tried and convicted of conspiracy to defraud the United States Government. Both were sentenced and served jail terms. 3. Petitioner's Involvement in the Tax Refund SchemePetitioner's role in the tax refund scheme was "minor." He did not prepare, sign, or file the fraudulent tax returns. He did not open the bank accounts into*149 which the refund checks were deposited; nor did he deposit the refund checks into or withdraw the proceeds from those accounts. He did not rent any of the rooms in the rooming houses or hotels which served as mailing drops for the fraudulent refunds. Petitioner learned of the false refund scheme in late 1971 or early 1972 when Kevin told petitioner that he and Frank were going to file false returns. He saw a false income tax return before it was filed, and he saw several of the refund checks which were ultimately received. Petitioner's actual involvement in the tax refund scheme was that of Kevin's sometime traveling companion in the drive from Kevin's home in Farmingdale, Long Island to New York City. Petitioner accompanied Kevin to some of the banks at which Kevin had opened the fraudulent accounts, and he also drove with Kevin to several of the banks when Kevin made deposits of the refund checks and withdrawals of the proceeds; however, he never entered any of the banks. Petitioner accompanied Kevin on some of his trips into New York City to scout out potential mailing addresses for the refund checks. He also drove into New York City with Kevin on several occasions to*150 pick up the refund checks. Petitioner entered several of the rooms which Kevin had rented, and he knew that the purpose of the visits was to pick up the refund checks. No person, other than petitioner, travelled with Kevin to scout out potential mailing addresses, to pick up refund checks, to open bank accounts, or to make deposits and withdrawals. At the criminal trial of Kevin and Frank, petitioner testified against both of them under a grant of immunity from prosecution. Petitioner was granted immunity in exchange for information regarding the "inside people" in the refund scheme. 4. Business Transactions Between Petitioner and KevinIn 1972, petitioner was attending college and was studying business administration and real estate with the intention of becoming a real estate agent. Petitioner regarded Kevin as a successful businessman, and he had discussed with Kevin the possibility of working for him as a real estate agent at some time in the future. Early in 1972, Kevin asked petitioner to assist in buying houses for him with money which Kevin was expecting to receive in the near future. At that time it was impossible for Kevin to purchase real estate on*151 his own because he had a bad credit rating. Thus, Kevin proposed that if petitioner would obtain the financing necessary to purchase a house and then sign it over to him when the deal was closed, Kevin would pay petitioner $1,000. In furtherance of this plan, Kevin and petitioner formed a corporation and a partnership to operate a real estate business. The corporation was named Vast Industries Inc. (hereinafter Vast); Kevin was its president and petitioner was its vice-president and secretary. The partnership was named J-K Management. This name was derived from the initials of petitioner's and Kevin's first names. Neither Vast nor J-K Management ever conducted any business of the type for which they were formed. Bank accounts were opened for Vast at Long Island National Bank and for J-K Management at Franklin National Bank. Only Kevin was authorized to draw checks on the Vast account. Both Kevin and petitioner were authorized to draw checks on the J-K Management account. In order for petitioner to obtain financing for the purchase of houses, Kevin advised petitioner to take certain steps in order to "get himself recognized in the credit world." Accordingly, in late March*152 1972, petitioner bought a new car, a 1972 Chevrolet, at a cost of approximately $4,600. Kevin loaned petitioner $1,700 from which petitioner used $1,650 as a downpayment on the car. Petitioner obtained a car loan from General Motors Acceptance Corporation (GMAC) for the balance. Petitioner's monthly loan payments to GMAC were $83.54. He made only two payments on this loan, in April and May 1972. As a further step toward establishing a favorable credit rating, petitioner opened a checking account at the National Bank of North America (NBNA) in March 1972. Pursuant to Kevin's direction, Kevin's funds were circulated through both petitioner's checking account and his savings account at County Federal Savings and Loan (CFSL), which petitioner had opened in October 1970, to create the illusion that petitioner had substantial amounts of money in his account and a steady cash flow. Kevin advised petitioner that as a result of this process, lenders would find petitioner to be a good credit risk and would be induced to extend credit to petitioner. In furtherance of this "cash circulation scheme", Kevin's funds were circulated through petitioner's accounts in the following manner. *153 Kevin lent petitioner certain amounts of money. Petitioner deposited that money into either his checking or savings account, sometimes transferring that money from one account to the other. Later, petitioner repaid the money to Kevin by writing checks payable to Kevin or Vast Industries. Petitioner knew that the funds given to him by Kevin and deposited into his accounts were part of the proceeds from the fraudulent checks. None of the funds given to petitioner by Kevin in connection with the real estate venture, however, were given with the intention that they be petitioner's to keep and use as his own. To further bolster petitioner's credit worthiness, Kevin prepared a false Form W-2 for submission by petitioner to mortgage lenders. The false Form W-2 indicated that the petitioner earned wages in 1971 of $14,500 from the American Banquet Corporation, a business operated by Kevin. Petitioner actually did not earn any wages from American Banquet Corporation during 1971. In conjunction with Kevin's real estate venture, petitioner proposed to his childhood friend Edward Quinn (hereinafter Quinn) in the Spring of 1972 that Quinn also buy a house for Kevin. If Quinn would*154 obtain the financing necessary to purchase a house and sign the house over to Kevin once the deal was closed, Kevin would pay Quinn $1,000 for his services. Pursuant to this arrangement with Quinn, Kevin advanced approximately $4,000 to deposit into his bank account both to bolster his credit rating and to be used as a downpayment on the house which Quinn would eventually purchase. Because Kevin and Quinn did not get along well, the money advanced to Quinn by Kevin was first given by Kevin to petitioner, who, acting as a middleman, then gave it to Quinn. Petitioner first deposited this money into his own NBNA and CFSL accounts and then drew two NBNA checks totalling $4,000 payable to cash, and endorsed by Quinn, for deposit into Quinn's account. On March 28, 1972, petitioner entered into a contract to purchase a house located at 110 Clinton Avenue, Port Jefferson, New York. He paid $1,000 down on the house which had been loaned to him by Kevin for that purpose. This loan was also circulated through petitioner's NBNA account. On April 1, 1972, petitioner also put down $50 as a binder on the house which was to be purchased by Quinn. Before the closing on these houses, however, *155 petitioner and Quinn decided during the summer of 1972 that, because of their distrust of Kevin, they did not want to continue doing business with him. Accordingly, petitioner informed Kevin of their intention to withdraw from the business relationship. He told Kevin that he did not want to buy the house for which he had contracted. Kevin informed petitioner that it was "fine" with him to discontinue the business relationship, but that he wanted to be paid back all the money which he had loaned to both petitioner and Quinn for the purpose of purchasing the houses. The deal on the house which Quinn was to purchase fell through. Petitioner, however, was informed by his attorney that he was liable on the contract which he had signed on the property at 110 Clinton Avenue. Petitioner and Quinn, therefore, decided to go ahead with the purchase of this property on their own. Based on Kevin's earlier advice regarding obtaining credit, petitioner and Quinn continued to circulate monies through each other's accounts to create the illusion of their credit-worthiness. Petitioner closed the deal on the Clinton Avenue property on September 7, 1972; he incurred at that time closing costs*156 of approximately $1,000. 5. Business Transactions Between Petitioner and QuinnAfter terminating their relationship with Kevin, petitioner and Quinn started their own real estate business through which they intended to carry on activities similar to Kevin's and petitioner's venture. They formed Colony Equities, Inc. (hereinafter Colony) on September 15, 1972. Petitioner transferred title to the Clinton Avenue property to Colony on December 4, 1972. Quinn handled all of Colony's financial affairs. Colony transferred title to the Clinton Avenue property to Romic Enterprises, Inc. (hereinafter Romic) on December 12, 1974. Romic was incorporated by petitioner and Quinn on August 1, 1974 for the purpose of operating two bars. At present, Romic holds title to the house, but has no other assets. Petitioner and his family have resided at the Clinton Avenue property since June 1973. Petitioner, who in 1972 obtained the mortgage on the property in his own name, remains personally liable on the mortgage and makes monthly mortgage payments. He did not, however, begin to deduct real estate taxes or mortgage interest until 1982. Petitioner and Quinn have had no business contact*157 since 1975. When petitioner and Quinn made the decision in mid-1972 to terminate their business relationship with Kevin, they determined to pay back the money which Kevin had loaned them in connection with their deal to purchase houses for him. Petitioner and Quinn obtained personal bank loans during the summer of 1972 totalling approximately $6,500. In addition, petitioner sold his car for $3,000. Petitioner and Quinn intended to use these monies both to repay what Kevin had loaned to petitioner and Quinn and to cover the closing costs of approximately $1,000 on the Clinton Avenue property. Petitioner repaid the loans to Kevin by check and in cash. Petitioner obtained a personal loan of approximately $2,500 from First National City Bank in early June of 1972. He deposited the proceeds of the loan into his NBNA checking account and then transferred substantially all of the same proceeds into his CFSL account. Petitioner also deposited the $3,000 proceeds from the sale of his car into his NBNA checking account. Quinn obtained two personal loans each in the amount of approximately $2,000. One of the loans was obtained from Chemical Bank. Quinn lent the proceeds of his*158 personal loans to petitioner and, on August 11, 1972, petitioner deposited $2,001.78, the proceeds of one of Quinn's loans, into his checking account at Franklin National Bank (FNB) which he had opened in August 1972. The same day, petitioner drew a FNB check in the amount of $2,000 payable to Vast. 6. Bank Deposits Made by PetitionerIn accordance with the above-described financial transactions, petitioner deposited into his three bank accounts and disposed of the amounts as indicated in the following chart: DEPOSITDATEAMOUNTBANKSOURCEDISPOSITION13/27/72$1,700   NBNALoan from Kevin toNBNA Check # 5petitioner forPayee: Konner'sdownpaymenthevroleton 1972 ChevroletAmount: $1,650Date: 3/27/7223/29/72$1,300   NBNAAdvance from KevinNBNACheck # 8for petitioner'sPayee: Bazell & downpayment onBrownClinton Avenue(attorneys forpropertyseller ofproperty)Amount: $1,000Date: 3/28/7233/31/72$2,100   NBNAAdvance from Kevin NBNAper cashCheck # 102 circulation schemePayee: Cash and for Quinn's (deposited creditinto CSFL)check and house downpaymentAmount: $2,000Date: 4/3/72NBNA Check # 14Payee: Phase Two Realty,Inc. (binder on house whichQuinn was to purchase)Amount: $50Date: 4/1/7244/ 3/72$2,000   CFSLRedeposit of Deposit #3 above per cash circulationscheme54/12/72$3,200   NBNAAdvance from Kevin NBNACheck # 114for Quinn's creditchecksPayee: Cash - and houseendorsed bydownpaymentQuinnAmount: $3,000Date: 4/12/7264/17/72$1,000   NBNATransfer from CFSLNBNAof deposit #4 aboveCheck # 117Payee: Cash - endorsed byQuinnAmount: $1,000Date: 4/17/7274/18/72$1,500   NBNALoan from Kevin perNBNAcash circulationCheck # 120schemePayee: Cash - depositedinto Vast Industriesaccount.Amount: $1,500Date: 4/17/7285/ 3/72$1,128   NBNALoan from Kevin perNBNAcash circulationCheck # 301schemePayee: Vast IndustriesAmount: $1,000Date: 5/8/7295/15/72$1,088   NBNALoan From Kevin perNBNAcash circulationCheck # 306schemePayee: Vast IndustriesAmount: $1,000Date: 5/15/72105/22/72$1,000   NBNATransfer from CFSLNBNAof deposit # 4Check # 313abovePayee: Vast IndustriesAmount: $1,000Date: 5/22/72115/25/72$ 300   NBNALoan from Kevin perNBNAcash circulationCheck # 315schemePayee: Kevin ManganschemeAmount: $300Date: 5/25/72125/30/72$ 525   NBNALoan from Kevin perNBNAcash circulationCheck # 317schemePayee: Kevin ManganAmount: $525Date: 5/27/72136/ 5/72$2,513.16NBNAPersonal loan topetitioner from FirstNational City Bank141 6/ 5/72$2,400   CFSLTransfer from NBNACFSLcash withdrawalsof deposit # 13 aboveDate:      Amount: above6/16/72$4006/23/72$2156/26/72$1  ,800157/ 2/72$3,000   NBNAProceeds from saleNBNAof carCheck # 346Payee: VastIndustriesAmount: $1,000Date: 7/10/72167/18/72$ 500   NBNASource unidentifiedNBNACheck # 348Payee: VastIndustriesAmount: $500Date: 7/15/72177/18/72$ 500   CFSLSource and FNB Check dispositionunidentified188/11/72$2,001.78FNBPersonal loan to FNB CheckQuinn# 110from Chemical BankPayee: VastIndustriesAmount: $2,000Date: 8/11/72198/29/72$1,124   FNBPersonal loan to Quinn209/ 8/72$ 500   FNBPersonal loan toQuinn219/15/72$ 500   FNBPersonal loan toQuinn*159 OPINION Respondent maintains that petitioner, along with Kevin and Frank Mangan, was an active participant in the fraudulent tax refund plot, and, as such, petitioner received and failed to report as income $15,829.54 which constitutes one-third of the proceeds. In support of his position, respondent relies almost exclusively on the testimony of Kevin Mangan, who testified that he gave petitioner one-third of the proceeds as compensation for his help in executing the plan. Petitioner, on the other hand, vigorously asserts that he did not participate in the scheme proceeds. He contends that he naively accompanied Kevin on several trips to New York City at Kevin's request, and that his role in the whole arrangement was so minimal that he could not possibly have received a one-third share. *160 He further contends that any of the ill-gotten scheme proceeds which he may have received from Kevin were loans made by Kevin to petitioner in furtherance of an unrelated real estate venture. Petitioner contends that it was his intention to, and that he did, repay these loans to Kevin in full in 1972. As to the alleged deficiency, petitioner bears the burden of proving that respondent's determination is erroneous. ; Rule 142(a). We find that petitioner has sustained his burden of proof and that he did not receive any of the scheme proceeds as determined by respondent. Because we hold that petitioner is not liable for any deficiency in his 1972 income taxes, it follows that he is also not liable for any of the additions to tax as determined by respondent. The ultimate resolution of the question whether petitioner shared in the proceeds of the tax refund scheme turns on a test of the credibility of petitioner and Kevin. After careful consideration of the testimony of both petitioner and Kevin, we hold for petitioner because his testimony on the whole was more credible than that of Kevin. Thus, the preponderance*161 of evidence tilts in favor of petitioner. It is abundantly clear, as our Findings of Fact demonstrate, that Kevin and his brother, Frank, were the major perpetrators of the fraudulent tax refund scheme. By their own admission, Frank originated the idea for the scheme and prepared the fraudulent returns, and Kevin actually signed and filed the fraudulent returns. Kevin scouted the mailing drop addresses; he opened bank accounts in fictitious names into which he deposited the refund checks; he withdrew the ill-gotten proceeds from those accounts and exercised sole control over the disbursement of the funds. He was later convicted, along with Frank, for his role in the scheme and he served a term in prison. Kevin himself admitted that he felt a certain bias against petitioner, who testified against Kevin at his criminal trial. Further, we cannot overlook the possibility that Kevin's trial testimony in the instant case might have been motivated by a certain degree of self-interest in order to reduce his own tax liability on a portion of the receipts here at issue. 3*162 We agree with respondent that in a case such as this, involving an illegal enterprise where the taxpayer has filed no returns and kept no records, respondent is given great latitude in determining the method to be utilized in determining income. . We find, however, that respondent's determination that petitioner received one-third of the scheme proceeds based on petitioner's admitted minimal involvement in the scheme and Kevin's uncorroborated testimony that he gave petitioner one-third of the scheme proceeds exceeds the latitude which we are willing to extend. 4 We find Kevin's account of the facts unworthy of belief for several reasons. *163 Kevin himself testified that petitioner's role in the refund scheme was "minor"; yet he would have us believe that he gave petitioner a full one-third of the scheme proceeds in compensation for his "minor" role. We find Kevin's characterization of the amount that he gave to petitioner as an "imaginary figure" quite apropos. We simply do not believe his testimony that he gave petitioner approximately $15,000 or any substantial amount merely for serving as his travelling companion and for providing moral support.Our disbelief of Kevin's account is sharpened by his admissions that he kept no records of his disbursements of the scheme proceeds, that there were no witnesses to his dealings with petitioner and, most significant, that he gave his brother Frank none of the scheme proceeds. We find it most unlikely, if not impossible to believe, that Kevin gave petitioner approximately $15,000 as compensation for his "minor" involvement, and yet gave his own brother, Frank, who actually conceived of the idea and prepared the bogus tax returns, absolutely nothing. Petitioner here is forced to prove that he did not receive certain alleged income, and, as noted by the Supreme Court in*164 : "as a practical matter it is never easy to prove a negative." We find, however, that petitioner's testimony, is sufficiently credible to satisfy us that he did not receive the scheme proceeds at issue. Significantly, the issue here is not whether petitioner's minor involvement would have been sufficient to incriminate him as a co-conspirator in the scheme. Rather, the issue is how much money, if any, he received from Kevin as compensation for his role. Based on petitioner's credible analysis of his bank deposits and disbursements, part of which was corroborated by Edward Quinn, we conclude that all amounts deposited into his bank accounts represented (1) loans from Kevin, made in furtherance of the real estate venture, which were repaid, (2) personal bank loans made to petitioner or Quinn, or (3) proceeds from the sale of his car on which he realized no gain. 5Petitioner was able to show*165 a precise relationship between many of the cash amounts deposited into his bank accounts and amounts which he later repaid to Kevin directly or to the Vast Industries account, over which Kevin had exclusive signatory power. In particular, deposit numbers 6-12, set forth in the chart in part 6 of our Findings of Fact above, match nearly dollar for dollar amounts that petitioner paid by check to Vast Industries or directly to Kevin Mangan. In addition to the funds involved in the cash circulation scheme, Kevin lent petitioner approximately $4,050 (see deposit numbers 1-3) in furtherance of the real estate venture. Petitioner was able to demonstrate repayment to Kevin or to Vast Industries by check of approximately $3,500 (see deposit numbers 15-16, 18) out of the proceeds of personal loans obtained by petitioner and Quinn and the proceeds from the sale of petitioner's car. Given the further fact that petitioner repaid some of the loans to Kevin in cash, as confirmed in part by three large cash withdrawals from his CFSL account in June 1972, (see deposit number 14) we are satisfied that petitioner did fully repay Kevin all of the monies advanced to petitioner in furtherance of the*166 real estate venture. Petitioner has shown that he obtained personal loans (both his own and Quinn's) totaling $6,500. He sold his car for $3,000. From this total of $9,500, he had more than enough to repay Kevin $4,050, repay his GMAC car loan of $3,000, and cover all closing costs on his house. Thus, we find credible petitioner's testimony, as corroborated in part by Quinn, that all of his bank deposit and disbursement activity was engaged in initially pursuant to a real estate venture in which both petitioner and Quinn served as "straw men" in assisting Kevin, the principal with a bad credit rating, to purchase houses. Later, the bank deposit and disbursement activity represented petitioner's efforts to repay Kevin and proceed with the purchase of the Clinton Avenue property on his own. Respondent contends that petitioner's bank deposit and disbursement analysis does not demonstrate that he did not receive any of the ill-gotten gains because such deposits and disbursements were made in connection with the real estate venture which was an activity completely separate from the refund scheme. We agree that the two ventures were not connected; however, we find that, based on*167 petitioner's account of the real estate venture, the cash circulation scheme and his subsequent substantial repayment of the loans made to him by Kevin, that petitioner's bank deposits and disbursements also demonstrate that he did not receive any income from the refund scheme. Further, we find no credible evidence to show that petitioner received any of the tax refund moneys that were not deposited. Respondent also contends that petitioner took certain risks in accompanying Kevin on several of the trips to New York City to scout mailing drops, to pick up the checks and to deposit the checks into the bank accounts.Petitioner would not have undertaken these risks, asserts respondent, without the expectation that he would be compensated with some of the proceeds. Respondent's argument is not without merit; however, we accept petitioner's testimony that, at that time, he did not fully comprehend the risks he was taking and that, once he did, he withdrew from the scheme, without receiving any share of the proceeds. Finally, respondent argues that petitioner's testimony is not worthy of belief because petitioner engaged in a series of fraudulent business practices including, among*168 others, his submission of a fraudulent Form W-2 to prospective mortgage lenders and his continued circulation of cash through his own and Quinn's bank accounts after they severed ties with Kevin. While we agree that petitioner is not himself above reproach, we do find that, initially, he engaged in these practices at Kevin's behest. Kevin introduced petitioner to, and encouraged him in, the use of such practices. We accept petitioner's testimony, however, that, to the extent that he engaged in these unethical practices, he was following the lead of Kevin, a person who, in petitioner's eyes, was as successful in business as petitioner himself hoped to be. Recognizing that petitioner does not necessarily qualify for an accolade for integrity, we find, nonetheless, that he has shown that he did not participate substantially, if at all, in the fraudulent tax refund scheme proceeds. Based on all of the foregoing, Decision will be entered for the petitioner.Footnotes1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. All "Rules" references are to the Tax Court Rules of Practice and Procedure unless otherwise noted. ↩2. In the notice of deficiency sent to petitioner, respondent attributed to petitioner as unreported income $47,488.64, the entire amount of the proceeds from the fraudulent tax refund scheme. It was agreed at trial that no more than one-third of the proceeds would be attributed to petitioner.↩1. In the joint Stipulation of Facts, the account name appears as "Scott McCarthy." This bank account, however, was opened in the name of "Scott M. Murphy" (see p. 7 supra), and a Federal refund check in the amount of $9,421.06, the same amount as deposited into this account, was issued to John McCarthy (see p. 6 supra↩). The refund check itself was endorsed with the signatures of both John McCarthy and Scott Murphy, and the deposit slip for this deposit was made out in the name of Scott Murphy. Thus, we find that Kevin had intended for this transaction to appear as though John McCarthy had endorsed the check over to Scott Murphy who then deposited it into his account. We also find that the stipulation is in error regarding the account name; it should be Scott Murphy rather than Scott McCarthy.1. In the joint Stipulation of Facts, deposit number 14 is shown as having been made on 6/2/72. This is so because the NBNA check used by petitioner to make the deposit is dated 6/2/72. Petitioner testified, however, and, an examination of the back of the check confirms his testimony, that the CFSL deposit took place on 6/5/72. Thus, we find that such deposit took place on 6/5/72.↩3. In the notices of deficiency sent to Kevin and Frank Mangan and to petitioner, each of the three was charged with 100 percent of the scheme proceeds. At the conclusion of the trial, respondent's counsel indicated that tentative settlements had been reached in respect of the deficiencies asserted against Kevin and Frank.Further, respondent's counsel also stated the following: We are taking the position that if the Court decides that Mr. Bertsch received an excess -- an income in excess of the amounts that we've already agreed that the two brothers received, we would not file those documents [the tentative agreements] as they are. We would not seek to get more than a hundred percent from the three individuals. We thus infer that during the course of settlement negotiations, Kevin may have decided that his own tax liability would be reduced by whatever amount of scheme proceeds he claimed to have given petitioner.↩4. We do not here hold that this case falls within the line of "naked assessment" cases which would shift the burden of going forward with the evidence to respondent to demonstrate that the notice of deficiency is not arbitrary by establishing a link between the petitioner and the illegal activity. . See also ; revg. ; , revg. in part . We hold that a link has been established between petitioner and the fraudulent tax refund scheme; however, petitioner has sustained his burden of proof that he did not receive the proceeds at issue.↩5. As noted in our Findings of Fact, petitioner purchased his car in Mar. 1972 for approximately $4,600. He sold the car in July 1972 for approximately $3,000. Petitioner, therefore, realized no gain on the sale.↩